And the last argument for today is Chris Adamson versus Pierce County Municipality et al. Case number 24-3545. All right. May it please the court, your honors, Joan Mel appearing on behalf of the nine SIU officers who are here requesting relief from the district court orders. I hope to reserve 10 minutes for a rebuttal and try to hit the highlights here in my opening. I feel a little deja vu. I think I was here in 2019 really with the same issue. If there is conduct by the prosecutor's office against law enforcement officers, in particular these SIU officers or investigators, where the prosecutors are fabricating or coming up with the content of materials that are critical of these officers, is that a purely prosecutorial function that immunizes them and protects them from any kind of liability? And the absolute answer must be no. It was error for the district court to distinguish Kalina v. Fletcher and the Ames v. Lindquist case that was before this court previously and rule on a motion to dismiss that there was no application because the statements promulgated by Shot, by Wist, were not in-court statements. I don't know why that would be a factor that would weigh against or in favor of prosecutorial immunity because, as we know, prosecutorial immunity is a nexus that's built around a purely prosecutorial function that is quasi-judicial in nature. If the statements were promulgated by conducting investigations and generating criticisms and giving statements to Kitsap County and giving statements to the media and out of whole cloth inviting other disgruntled coworkers to come forward and complain. It would help me if maybe we focused on a few of the alleged wrongful acts and whether or not the prosecutors are entitled to absolute immunity. And one that I find interesting is they wrote their reports as to why they weren't going to go ahead with two prosecutions. I don't understand. There were two, the DAs. Decline memos. They declined to file two cases. Correct, correct. And they wrote a report or they wrote a memo, not a report, but a memo explaining why. Right? Well, there's Wist's memo on the one case. There were two memos, yes. And then there's two documents on the. Just hear me out for just one second. Absolutely. Are they entitled to absolute immunity for those two reports? Absolutely not. Why not? Because the content of the report. They were making a decision about whether or not to file and the reasons for not filing a case directly in court. Well, they weren't. My argument is that it was pretextual just by timing alone because they did it well after they declined the decision. But if you say we're not going to delve into decline memos because decline memos are purely prosecutorial in nature, the content of those decline memos is their content. It is the Kalina B. Fletcher analysis because the criticisms are their own and not just opinions of the evidence. How do you get over? That's what a prosecutor does is it makes a considered or ill-considered judgment, prosecute or not prosecute. It just seems to me that's the weakest part of your absolute prosecutorial case. And I'm going to go later to the question about the FBI. Correct. What's your best case for saying that a prosecutor's memo, internal memo on whether to prosecute or not is not subject to absolute immunity? What case? Who authored the facts? No. What case? Kalina B. Fletcher. And actually, Your Honors, there's a very good case that Sergeant Darby just learned of out of the Eastern District of Pennsylvania. It's Bologna versus Krasner. Is that in the briefs? It is not in the briefs. Rather than discussing it here because we don't have it, the better procedure would be send us a 28-J letter with an additional citation. Okay. Yes, I can do that. I know that the timing had come and gone when I learned of this particular memo. Well, no. I mean, we're always open to hearing about another case. Yes. Well, it's telling because it goes through in depth where are the facts coming from. And the Rowe case, as the court is looking into, is one where Rowe is not, or the prosecutor, I can't remember which one was the prosecutor by name for certain. But the prosecutor is sitting there receiving information from law enforcement. The law enforcement is critical of it. And also from in-court testimony assessing the credibility of the officer. But the declined memo there was also alleging pretext, that there were false things in that declined memo. And the court, the panel there, found that it was still absolutely immune from suit. So that seems to foreclose your claim in my view. It doesn't when you look at where those facts are coming from. It's not the facts of what occurred. It is the facts that the prosecutor is saying occurred. It is the prosecutor testifying, for instance, that the conduct at issue that Darby did a particular search of a premises when Darby didn't do a search of the premises. When the prosecutor is saying, the prosecutor is testifying in UIST on Wales that there were two doors, not three. That's the prosecutor's dishonest statement in the declined memo that creates the. But if it's officially connected to the court process or the judicial process, as Judge McEwen said. Right. It could be a wrong reason. It could be a stupid reason. It could be any reason that's ridiculous. But if it's connected, why doesn't it get, it still seems to be that it's entitled to qualify, I mean to absolute immunity. Not under Kalina v. Fletcher. Well, I guess I'll have to go back and read Kalina v. Fletcher. When the prosecutor is generating the content and attesting to the circumstances as they occur. Here we have UIST saying. Is Kalina v. Fletcher about a declined memo? Is that case related to a declined memo? No, it's not. It's not a declined memo. It's. Why is it so pertinent in your mind? Well, because it's testimony. It's factual. It's where is the, who is the author? Author of the information. And not author of the opinions of what the underlying facts, how to weigh those. But making up the facts to put in there from its inception for an animus that's inappropriate. And that's where you get into how did all these facts come into being? We're talking about a declined memo that's not generated from law enforcement reports. It's generated from the communications and investigations and outside the scope inquiries that these prosecutors are making of these SIU investigators. And the only, the very important distinguishing factor here from those other cases or Roe is that the relationship and the abuse of authority came and was derived from these prosecutors being able to control the sheriff's department and leadership there because they are the prosecutors for that office on the civil side. It would never have happened had the employment relationship not existed. This hasn't happened to any other law enforcement officers doing exactly what these law enforcement officers do in Pierce County because they don't work for Pierce County and they're not subject to this behavior that is. This is a, I'm just going back to Colina V. Fletcher right here and that related to an affidavit related to an arrest warrant, right? An affidavit of probable cause, I believe. Well, that's what you need to get an arrest warrant. So that was the prosecutor making false statements in that affidavit with respect to probable cause, right? Right. So that's not the same as a decline memo. Well, it's a decline memo is further removed from the quasi judicial process and it's not even, there's no even real nexus to a charging decision. If you go back to all of the cases and in particular in Colina V. Fletcher, I really like the analysis that's in the Dinsman case, I believe it was. Dinsman case where they parse through the relationship and the motivation and that's ancient old case law, but the relationship between the ship's captain and what he's doing and what's motivating and he's truly acting in this one particular role or is he stepped outside of that role? A decline memorandum done when they did the decline memorandum was comprised of content that was generated by their own investigative activities, not a law enforcement investigation. If you look at Roe and those other cases, you're talking about law enforcement investigations of underlying crimes and the investigation itself is the law enforcement investigation. Here we're dealing with an investigation that's conducted by and headed up by Schott. Schott is interviewing the SIU officers and other colleagues of theirs and saying, what do you think they've done wrong? Well, I think they've done this wrong. Obviously there's two doors, not three doors. Well, wait a minute. Can I ask you about that? As I understand it, one of the bases for that investigation was to determine whether he needs to turn over exculpatory evidence or Brady material. And so why isn't that within the parameters of a prosecutorial function? Because the motive wasn't there. The motive really was I'm going to sit on these guys because I don't like what they're doing. But assuming that we don't get into what the particular intent is, he's conducting an investigation, a Brady investigation. Well, there is no such thing as a Brady investigation. Prosecutors are supposed to gather whatever they hear from an investigation that they need to disclose. They're supposed to be compiling the information and saying, yes, it's Brady. No, it's not Brady. Here they're generating. Well, we have cases that talk about a duty to investigate to make sure that exculpatory material gets handed over. But have you seen a case where that investigative duty has been anything more than reaching out to law enforcement and getting the investigation of the criminal action, not a prosecutor investigating the law enforcement officers? That's the difference. The prosecutors were taking not taking the investigative materials on their face. They were taking they were demanding law enforcement provide witnesses through their colleagues. They were demanding each of these individuals that they could only do because they were the employer demanding that they come and sit with them and subject themselves to cross examination, not on the underlying facts of the case. And Darby's Darby said it right in the interview with shot. He's like, are you just here to criticize the way Darby does work? Are you here to know what happened in the facts of the underlying case? And shot says both shot is expanding his role beyond gathering Brady material or ascertaining if there's Brady material and creating it by conducting the interviews. But that's my question. Let's say there's dual motives. Let's just let's say it's shot. It's trying to investigate to see if wrongdoing is happening by the by the officers and is trying to determine whether to collect whether there's Brady material. Isn't that still subject to absolute immunity? Absolutely not, because you know what where the investigation is supposed to incur on the law enforcement side. And the county has established protocols and procedures for doing that. Acted as the investigator rather than the complaining witness. And he was given deference because he was a civil. He was the prosecutor in that side of the aisle, advises the sheriff. And the sheriff just said, whatever you tell me they did wrong, they must have done wrong. Rather than staying in a sheriff's role of saying, no, I will conduct the investigation into my officers or I will farm it out for investigation. And the findings will be the findings here. Ultimately, they shot makes the big, big error with justice and FBI. And it's like you, you guys were corrupt. No, they weren't. You were wrong. So he has to be liable for that. Then he comes down and says, okay, well, egg on my face. They must have done something procedurally wrong. He convinces through his own interpretation of wrongdoing based on facts that he made up that were not correct facts that there should be this Kitsap investigation. And then who provided the testimony for Kitsap that Kitsap relied on? We're mixing and matching. And it seems to me that was one of the problems with the briefs. You've got to go through each of the claims. Same problem with the district court. So we've talked about the memo to decline. Now you're talking about statements to Kitsap County investigators. Right, it's each piece of different conduct. Well, that's right, because each of those claims has to be analyzed for absolute immunity. You can't just say, yes, no, it's not a global thing. So I'm inclined with your argument on the statements to Kitsap County investigators that that was not part of what we would consider normally the traditional function of the prosecutor. And why is that? Because there they become witnesses. Right. But I think that's different from the decline memo. Oh, absolutely. It is. The decline memos are a much more nuanced argument than those other elements.  Now we've talked about decline. We've talked about Kitsap. Let's talk about the FBI. And so is your position on the FBI the same as essentially the Kitsap County investigators? Yes. What is your position? Yes, and even more egregious in that Schott was the complaining party. I mean, he came up with this erroneous theory of corruption that was I'm down to five minutes and I wanted to reserve. So, well, no, we'd like to actually understand each of the claims. OK. All right. Absolutely. So, yes, it's it is not unlike Kitsap. They're there. Oh, he's a witness, but he's. Would you call that an administrative role? I'm going to reach out to the FBI. I'm going to use my connections. I'm going to facilitate this this investigation by providing what I believe is my interpretation. Erroneous one, albeit of a text. That raises a question, though, that would basically chill interagency cooperation between law enforcement. If we take your position. Why? I mean, the law enforcement can go to law enforcement. Schott didn't need to be there. Schott didn't need to be interpreting the things. Schott should have been a complaining witness, a statement taken, recorded, verified and given to given to the FBI if that was the concern. But no, Schott, Schott, he was going to be there. He was going to shake down the witness because he knew he was going to get it. You know, he knew that there was corruption and he he had sniffed it out and he was going to. I think it's ego and power and just an investment in, you know. A colored lens, you can see it in the Clark County report. Once Clark County got involved and they weren't being directed, directly influenced by the prosecutors who were otherwise controlling the narrative. They're like, this is you are way looking at the result. If we're going to go through each of the claims, even though I don't think the briefs and the district court did that in the same way. Thank you for claims for which we find there is not absolute immunity. Do you agree that would be remanded and then qualified immunity or any other defenses would come up? Well, because I've been here before on some of the same clean arguments, I would think that they should have known better from the get go. My question, pretty simple one. If we decide some of these were not entitled to absolute immunity. Right. That would be a reversal. Would would the remand in effect take up the question of qualified immunity? The reason I'm hesitating is because there was kind of an indication that qualified immunity was addressed. But I don't think that it could be adequately addressed. And I think it should be addressed. The more correct answer would be to allow the discovery on the facts. So you get the facts specific to immunity and then you can apply the qualified immunity to that conduct. Thank you. Yes. Can I ask you before you step away, switching gears on the officer defendants and the Pickering analysis? So the summary judgment order. Is that. Is that ultimately a factual issue or a legal one that we're going to resolve? Because it seems pretty clear that there is some level of disruption that went on. When if the if the prosecuting attorney says we can't trust or we don't believe that the stuff coming out of S.I.U. is is. Credible enough to pursue prosecutions for. Why wouldn't that be sufficiently disruptive in order to say on a balancing analysis that that overcomes plaintiff's First Amendment rights? Because the prosecutor has to be accountable to the public and the electorate for the prosecutor's decisions. The sheriff should have been standing in the role of. OK, so you're not going to charge. The cases that involve these S.I.U. officers. They didn't do anything wrong. That's your call. They shouldn't have been punished as a result of an overreaction of prosecutor Rob Nett to these officers defending their position. I mean, if if you deem from the viewpoint of, well, I guess what you're asking me is if I'm a reasonable person viewpoint, the fact that cases aren't going to get prosecuted that are investigated by these officers, isn't that sufficient disruption? No, that's not disruption. They're continuing to investigate crimes. They're continuing to get drugs off the street. And they actually are doing the benefit of getting the drugs off the street, whether prosecuted or not. And then that's on Rob Nett. If she chooses not to prosecute because she doesn't like these guys, that's where the law rests. But if these guys are wrongfully accused and the sheriff knows that he can't punish them just because the prosecutor has thin skin and and and doesn't want anybody to question her actions. It upsets the balance so much between affording SIU investigators some level of discretion to conduct their investigations as they deem appropriate. And the problem with this is it never would have happened in the way it happened, but for the election and the desire to tarnish Fajardo. Let me ask you a question. What you said that they were punished or words to that effect? Yeah. Was that because they shut down the unit? Shut down the unit. Was there any specific action taken against individual officers? Probably that you know, probably that you allege in the complaint was a very long complaint. Whatever happened to the short, sweet complaint that the federal rules used to allow for? The ruling that said if I don't have it in there that it gets out of hand. You don't have everything in there. But yes, we'll take it. I don't remember seeing in the complaint the parts that I looked over where there was individual adverse action taken against particular officers. I gather what you're complaining about is shut down the unit twice. If you look in there, so where I'm trying to think if we're on summary judgment or just at the complaint. Stepping back. Summary judgment because that's. Okay. So if you look at each of these individual officers, you read their declarations. They are compelling and they're very moving. And probably the number one most offensive thing that was damaging to them was the decision to publish their names in the newspaper. That I mean, it just will get to that. But I mean, just to Judge Pius's question, what is the punishment involved in deciding not to continue a unit and sending the officers to other administrative positions? The adverse action or punishment is that these officers regularly and routinely consistently worked overtime because of the nature of their work they were always on. With the removal from that position, they lost, one, the ability to do the overtime because they were restricted on overtime. They weren't approved to do overtime. So there's a large financial hit. But there's also. And that's in the complaint? Yes. Okay. Yes. And it's in their declarations. So we're on summary judgment here. That's why I asked that question. But yes, those details are there. And then reputational harm. These SIU investigators were known and recognized for their success and their ability in working with informants effectively. They were consulted regularly. They had really strong working relationships with other law enforcement agencies. And once this shadow came over them that they were corrupt somehow, they couldn't get rid of that stink. And nobody would even talk to them. So they were shunned in a way that was particularly harmful emotionally and professionally. They couldn't. They weren't even looked at. And some people kept saying, well, Fajardo in particular with her political campaign. I mean, she's like, you carry this taint of doing something horrible even if you didn't do it? What? What? I mean, where's the accountability on the prosecutor's side if you get it wrong? So they responded, I guess it was to the DA's listing of the Brady. Giving out the Brady list. So the. They then responded to the press, correct? My SIU officers responded. There was a series of questions, and those questions are in the record that the media proposed and wanted answered. And they answered. And they answered those questions.  Some of it was reported. Some of their responses were reported. And really, they said exactly what Clark County said was the problem. This was a communication meltdown. It was politically motivated because if you can have Fajardo look bad in the press at this particular moment, and you can blame her, this is good for the status quo. Is that the First Amendment Act that you're seeking to vindicate? That is, that they were retaliated for? Absolutely. Okay. Now, is it. In the affidavits or in the summary judgment proceeding, it seems like. I mean, this caused quite a disruption in the police department and with the DA, so that there was friction between the DA and the police, sheriff's department. There was friction, but not because of what my clients did. The friction and the disruption that you're looking for in a Pickering analysis is how did these folks behave? Did they go outside what can be reasonably expected that they should or could or can do? No. They spoke to the media, and they gave their side of a story on an issue that was being publicly discussed and out there because of the prosecutor's office and the sheriff's department saying, oh, yeah, we've got these corrupt officers, and we know something's wrong, and we don't know exactly what it is, but we're going to get down to it. You cannot have First Amendment retaliation if you can't protect their right to go tell their side of the story. Can I ask about that? For the prosecutors, and whether it's wise or not to have published the list is a separate question, but you have – government has a right to speak as well, right? And the prosecutors say something about your clients. Your clients respond in public, and so there's competing versions of events about what happened. Why is that the basis of a First Amendment retaliation claim? In other words, why is it that your clients have a right to speak, but if the prosecutors speak, it's retaliation under the Constitution? Well, because that's not the comparator. The prosecutor demanded that some sort of punishment be invoked, and as this complaint has been pled, I didn't sue Mary Robinette. I didn't sue Mary Robinette because the ones who ultimately invoked the punishment and caused or invoked the harm was the sheriff and the undersheriff who said, okay, you were upset based on our side of the story when our people have said, fine, you will no longer have to deal with it, and we are going to shun them and sweep them under the carpet. So it's not – he said – But I guess my point is if you're going to sue a non-employer, the prosecuting office, or the defendants within that for actions taken by the sheriff, you're going to also have to establish that they were controlling the actions of the sheriff, don't you? Well, like I said, I didn't – I – on the First Amendment retaliation, the argument is that Pastor and Baumkamp retaliated. They based their retaliation on the invitation of the prosecutor, and it's all peer-scanning. So there's not a retaliation claim against the prosecutor? I didn't sue – I didn't sue her for that. The retaliation was shutting down the department? It was shunning these guys and removing them from their positions.  Yes, and the meaningful work assignments. You can see in adverse action cases and retaliation.  If you're shunned and you're given meaningless work, I mean, Darby sat on the bench. Darby is, let's go, you know. You sit him in a property room twiddling his thumbs, that's insanity-making. Okay, I think we've gone way over, so let's hear from your opposing counsel. Thank you, Your Honors. Thank you.  Good morning, Your Honors. May it please the Court, my name is Frank Cornelius, and I represent all appellees. There are two parts to appellant's appeal. I think the Court was focusing on it at the last argument. The first part primarily focuses on prosecutorial immunity, involving potential exculpatory and impeachment evidence determinations and charging decisions. And then the second part primarily focuses on liability for two shutdowns of the Pierce County Sheriff's Office Special Investigation Unit or Drug Unit. The District Court's Rule 12b6 dismissal of claims based on prosecutorial immunity against all named appellees was proper. Review of a motion to dismiss is limited to the contents of the complaint. Allegations and argument first appearing in appellant's brief and not in the complaint should not be considered. Here are the factual allegations in appellant's complaint against appellees. Triggered immunity. Claims against appellant shot relate to potential impeachment evidence determinations and his involvement in the criminal prosecution of two cases. Claims against appellee Wist relate to his involvement in the Wales case and his decision not to prosecute. And then the claims against appellees Pastore and Baumkamp relate to their assistance or involvement with the prosecutors in regarding the Brady determination or Brady pie evidence. Police have an equal duty to comply with Brady pie obligations and they are also given immunity for those actions. Absolute immunity from civil liability focuses on the function performed by the prosecutor and not the job title of a prosecutor or any intent of the prosecutor. The reason the focus is on the function and not the intent of the prosecutor is to protect the judicial process. Let me just ask you this. So we focused heavily on the decline memos with your opposition counsel.  But I want to ask you about the press. So you're now talking about the press, the giving information to the press, the prosecutors. Brady list. Giving the Brady list. Giving the Brady list, yes. Are you asking whether or not that would be something that would be discoverable?  Is that a function of a prosecutor? Oh, I see. It's a subject to absolute immunity. I see. For not being, you know, clear with my question, but my colleagues clarified it. The claims against prosecutor Wist and claims against prosecutor Schott don't relate to giving the pie list to the news media. A pie list, I think, is inherently public information. And a request then to give a pie list out is not something that is protected or is confidential. But as it relates to the claims in the complaint against Wist and Schott, there is no allegation that they disclosed it. But the prosecutors got for that act, for giving it, they complain about that in the complaint. They complain about it. Against the prosecutors. Yes, they do. And so the district court granted them absolute prosecutorial immunity for that, for doing that. Again, I don't believe the complaint alleges that against Schott or Wist. I think if that allegation is made, it's really wrong. It was a very long complaint. I thought it did, but maybe I'm wrong. But also even in the motion to dismiss proceedings before the district court, the plaintiffs are raising the argument that prosecutors are not immune from making statements to the press. So I think that is fairly encompassed within one of the challenged actions that plaintiffs are raising. Again, if we're talking about the defamation claim. No, we're talking in general. Case law says prosecutors who give public statements to the press are not absolutely immune. And the district court appears not to have addressed that individual issue on a functional basis, as you say we have to do. Wasn't that a mistake? I don't believe so in this case. Based on the allegations in the complaint as it relates to DPA or Prosecutor Schott or Prosecutor Wist, I don't believe the complaint had allegations that they specifically provided information to the press. The question for the prosecutor's office. That would, I believe, relate to the defamation claims that appellants brought. But as it relates to the prosecutor's office itself, then I don't believe that the statements that were made then would have been defamation. But as it relates to the prosecutor's office itself, to answer your question to be very direct, no, absolute immunity.  Absolute immunity would not apply to that. Okay. Depending on the circumstances, though, I do believe qualified immunity could apply to that. Well, sure. And we're at the absolute immunity stage. Right. So let me ask, going back to absolute immunity and claims with respect to the prosecutors, discussed with counsel two specific incidents, one related to talking to Kitsap and the other related to the FBI. And how is it that that conduct is part of the prosecutorial function that would be entitled to absolute immunity? I believe under the circumstances, and again, based on the allegations in the complaint as they were made, those circumstances arose as a result of prosecutors' shot involvement in the charging decision of those two cases that are cited in the complaint. And I believe it's suspect one and suspect two were the Benitez case that we later learned. I believe the record shows that prosecutors shot as the chief felony deputy assigned those cases to him for the charging determination. The record also- I understand all that. Let's get to the point. And that is the talking outside the prosecutor's office and, for example, giving a little tip, if you will, or heads up to the FBI or to Kitsap County. Are those allegations part of allegations against the prosecutors? And how would they qualify for absolute immunity? Again, I don't believe those allegations in the complaint were directed at Schott and Wist as it generally applied to defamation. As individuals, if you were to consider this, and I believe we did make this argument generally in our summary judgment motion, that other employees of the county, be it prosecutor, be it the sheriff's department, those types of witnesses that would have participated, for example, in the Kitsap County investigation, those witnesses, their involvement would be subject to conditional immunity and or I believe it's- I'm like totally confused by your answer. So let me just take it one at a time. Let's go to the FBI. Is it within prosecutorial absolute immunity for a case for which there hasn't been yet probable cause to give a tip to the FBI, which is take a look at this, guys? If it involved a connection with the judicial process, and in this case, I believe the involvement of the FBI came about in looking at the charging decision involving the Benitez case and a question as to whether or not there was actual drugs found. That doesn't really answer the question of the- The prosecutor can be a prosecutor and decide to prosecute a case. One of the difficulties here is these prosecutors also became witnesses, in effect, in different contexts. That's why we're looking at it separately. So just so I get your answer right, you're saying because there was this issue with Benitez that one or the other of the prosecutors could have told the FBI to take a look, or was it the FBI coming back? I believe in this case the facts were that DPA's shot contacted those entities. Okay. So how is that within prosecutorial immunity? Again, I believe that arose out of looking at the charging decision of Benitez, and so therefore it would have been related to that part of the judicial process. Well, that doesn't make sense. The charging decision is I'm going to prosecute or not. But it doesn't let you say, well, now that I am or am not and I know all this stuff, I can now go, I the prosecutor, to a different law enforcement agency that's not related to my office, not the Pierce County office, not the Pierce County sheriff. So you're saying, in your view, just because it was part of the charging decision, they can do whatever they want with it? I'm not saying they could do whatever they want with it, but I believe in this case it was related to making that charging decision. For example, your brief, I look pretty hard. I didn't even see a reference to the FBI allegation in your brief. Again, Your Honor, I believe this came out, and I believe it is indicated in the shot material, in the memo, the decline memo that Prosecutor Schott provided. No, but the whole issue of whether there's immunity vis-a-vis the FBI, you didn't even address that. Again, I would have to go back to referring you back to the complaint. And in the complaint at that time, I don't believe that there was reference, as it relates to DPA Schott or DPA Wist, regarding that. Overall, generally, it may have applied to the prosecutor's office. But I think in that circumstance, no. Well, the complaint has an allegation that Schott undertook a clandestine external FBI investigation into plaintiffs upon fabricated allegations of criminal corruption that had no basis in fact. So the complaint is raising the referral to the FBI as a challenged action. And again, I believe as appellant has argued earlier, it wasn't DPA Schott conducting that investigation. His actions involved. No, no, he's like giving a tip-off to the old FBI. You know what I'm saying is he's going outside of being a prosecutor. It's what we would normally see with law enforcement. The gloss about this case is the Supreme Court is very clear that absolute immunity is handled very narrowly. It has to be very intimately tied to the judicial process. And so charging decisions, presentation of evidence in a criminal proceeding, all those things would apply. But then you've got these outer boundaries that don't, such as press statements and whether you're speaking to the FBI about potential criminal activity or even what I was going to get to is speaking to the Kitsap investigators. Why is that subject to prosecutorial immunity, to absolute immunity? And again, I think for purposes of the 12B6 that was before the district court, those allegations, if any, were not as clear in the complaint. I think that developed. If it did develop, it developed later during the course of the remaining portion of the case that focused on the sheriff department and the other appellees. But with that said, I don't disagree that if actions were taken that were outside the prosecutorial function, that absolute immunity would not apply. And I believe then we would default to a qualified immunity analysis. So we've talked about the decline memo. We've talked about the talking to these other two law enforcement departments. We've touched briefly on the release of the Brady names to the newspaper. So is that a function of the prosecutor's office? A function of the office. Again, looking at the claims in the case as far as against Schott or Wist. Right, and that's who I'm talking about now. I don't believe that the facts show that they released this information. I do believe the prosecutor, I believe the facts came out that the prosecutors did release that information in response to a request from news media. And again, our position would be is that information is not confidential or privileged. But as it relates to Schott and Wist, I don't believe that that issue was before the district court in deciding whether or not to apply absolute immunity. This was done on the complaint though.   And in the cause of action or the claim for relief under 42SC section 1983, free speech and redress, she just lists the defendant, the complaint just says the defendants. She doesn't go through and identify particular conduct. So I assume it's against the two prosecutors that she's after here. Again, in our motion to the court on 12B6, we provided a table that identified the allegations specifically against the prosecutors. And we cite to that in our appellate brief. And in those sections, specifically, for example, looking at the facts section, the allegations relating to Brady and Pye, the allegation that law enforcement agencies do not hire Brady or Pye officers like plaintiffs. Again, all of that was directed at those actions related to Brady Pye. That type of action or conduct is a traditional function of a prosecutor. Likewise, as you go through the complaint, and this would again be in the facts section, and this is section five, and you look at facts regarding the Pierce County Prosecuting Attorney's Office investigation. And again, it says Pierce County prosecutors solicited criticisms. DPA shot convened a series of compulsory interviews. Well, again, that is part of the charging decision. I believe the RCW, that's applicable here. And we cited in our brief requires that a prosecutor interview material witnesses. And in this case, the SIU officers, the arresting officers, those would be witnesses as part of this case. Likewise, a prosecutor is obligated to understand or become familiar with the techniques that were used in the criminal investigation. And this would also include the use of confidential informants. And so, again, that – But can I – you know, the problem is that the DA – I mean, is that the district court just said this is all connected to the court. They get absolute immunity without going through carefully each of the defendants. I mean, they all get absolute immunity. Just, you know, the district court gave the prosecutors absolute immunity here. Correct. And the district court did not go through each individual officer on what they were alleged to have wrongly done. And again, I would refer back to the complaint. The motion to dismiss. Here's the complaint right here. I agree. I agree, Your Honor. The complaint is very long and it is very convoluted. But again, as we attempted to do in our motion to dismiss, we laid this out in a table and we showed the allegations. Well, let me get back to the allegation about Schacht interviewing SIU officers. To me, I think this is – this one is a closer question in my mind because on the one hand, prosecutors do have a Brady obligation to turn over exculpatory evidence in criminal proceedings. But on the other hand, the cases also talk about if the prosecutor acts in the place of an investigative officer to see whether a crime was committed, that is not part of the prosecutorial function. And in my colloquy with your opposing counsel, I asked whether if you had dual motives or dual objectives in doing so, whether that would be absolutely immune. And she said no. And so I'm wondering how you would characterize this investigation by Schacht to the SIU officers and ask you the same question. What if you had a couple of different motives? What then? I don't think the court ever gets to motive or intent. I think the court strictly looks at the function. And here I believe, as the allegations in the complaint showed, that the function at issue was regarding the termination of Brady and Pye and charging decisions. And that's what the court focused on and I believe the district court focused on. So, again, I don't believe that. Having dual motives, I don't think that changes the analysis. I think you look at the function. It just turns on what the complaint alleged because I think the complaint alleges that Schacht was doing this in order to investigate these officers to see whether a crime was being committed. In which case that would fall outside of the prosecutorial function. The complaint alleges not on that. It makes that allegation that he did this for a wrongful motive or an animus. Nevertheless, the action that the complaint alleges is prosecutorial function. He is looking at a charging decision and he is also looking at Brady Pye. And I would say that the case law then – So can I just interrupt you? So when he was interviewing SIU officers about their methods, that was in connection with whether to charge someone in particular? Is that – was there a particular case or cases that it was associated with that investigation? Yes. And that is the – Which ones? That is the Suspect 1 case that we've made reference to and that's also identified in the complaint and I believe the Suspect 2 case and or Benitez case. And that's what he had assigned himself, those two particular cases. Those are also the two cases that are subject of his decline memorandum that he prepared. And so that's the actions that he's taken. He's doing both because he stands in the shoes as both. He is the chief felony deputy who assigned himself the charging review or decision for those two cases. And he was the Pye committee chair and he was looking into Pye. So he was performing both those functions at the same time. And so both of those functions are traditional functions of a prosecutor. And I would say again that the intent, as alleged, and I believe the district court, again, accepted that as true when it considered the 12B6 motion because it was alleged in the complaint. But the analysis or the determination didn't change. The function was the function and it was the charging decisions and the determination of Pye. Can I switch your gears to the summary judgment for the officer defendants and how we approach the Pickering analysis and ask you the same question? Are we dealing with a more factual or legal inquiry here in terms of whether there was disruption to the department? And even if plaintiffs had First Amendment rights, that there was a, on a balancing analysis, an ability for the sheriff to shut down SIU because of the disruption that happened after the press contacts? I believe it's a little bit of both. I believe factually that the prosecutor Rob Nett's decision at that time to not take cases from SIU pending the Kitsap County determination did cause a disruption to the sheriff's department. And I think that's what the sheriff's department, Sheriff Pastore, was responding to at that time. And I think the record shows that under Sheriff Baumkamp, he testified during deposition that, well, once we received this information from the prosecutor's office, we had to make the decision. If they're not going to take cases, SIU cases to prosecute, what are we going to do? Are we going to continue to go out and investigate cases knowing that there would be no prosecution? And I believe Baumkamp testified that, well, we don't want to put our officers in harm's way. We don't want to take that risk. And that was part of the decision making in shutting down the SIU that second time. Let me, could I just get one clarification from you on that, on the shutdown the second time? Had the officers already responded to the, made their response available to the press before they took that, before the sheriff took that action? The response to, yes, Your Honor, yes, it was. And it was. So the list was published. The Brady list was published. The list had been published prior.  Officers respond. As appellant's attorney indicated, they were asked questions.  But they responded to some of the concerns. Correct. Right. That's given to the press and the press published. The press published the information. That response, correct. I'm sorry. I'm going to stop speaking loudly. I'm sorry, Your Honor. That's okay. And then, what was it, several days later? I can't recall the exact time frame, but I believe it was fairly close in time to when the article was published that Rob Nett notified Baumkamp that she would no longer work or accept cases from the SIU for prosecution. But when was the SIU shut down the second time? I believe it was shut down approximately a week, a few days after that. It was not immediate. Okay. When Rob Nett wrote her letter to the sheriff, I gather that caused some disruption in the sheriff's department? Well, again, they were put on notice that the prosecutor's office would no longer, at that point in time, prosecute SIU cases pending the Kitsap County investigation. So, yes. So, when the officers answered those questions of the reporters, what do we know about how much further disruption that may have caused? Within their action, as far as talking to the news media, I don't believe created a disruption within the sheriff's department. And I think, likewise, Sheriff Pastore and Under Sheriff Baumkamp testified at deposition. They didn't have a problem with the SIU members talking to the press. Their response in shutting down the SIU was based on Rob Nett's decision not to prosecute cases at that time. And then I think the district court correctly analyzed that issue as weighing the interest. In this case, being the dysfunction or inability at that time for the sheriff's department to investigate or do drug crimes because the prosecutor's office would not prosecute. So, it was because of what the prosecutor did, Rob Nett. That's correct. Not so much the officers going to the press. That is correct. And I believe I did try to make that argument in our briefing. That it wasn't that Pastore and Baumkamp did not have an issue with the SIU talking with the press. That this related to Rob Nett's decision. And that the sheriff ultimately had contractual authority, and I believe the authority overall, to shut down the SIU. And I believe the district court recognized that under the Pickering analysis in weighing the interest of assuming, like the district court, that they did have a First Amendment right to talk to the press. And that here the interest of the sheriff's department in, I believe, maintaining a relationship, a working relationship with the prosecutor's office and trying to figure out what was wrong outweighed the First Amendment interest. Okay. Let me see your mic. Thank you, counsel. Thank you. Thank you.  We'll give you three minutes for rebuttal. Thank you, your honors. In brief, on the publication issue, those facts are at 5.207 to 5.215 of the complaint. And it is somewhat nuanced. It does allege that the sheriff's department ultimately disclosed the names, but the prosecutors built on that in their publications in the media. And as it turns out, through discovery, we learned more about that relationship between the prosecutor's office advising and disclosing the Brady officer names by names later on. But for purposes of just a summary dismissal on that fact, the facts are there that both the sheriff's department and the prosecutor's office were involved. The interesting ruling from the trial court is that they sort of gave prosecutorial immunity to the sheriff's department for those acts that would be related to Brady. So there's a nexus there. With regard to the allegation that Brady lists aren't confidential, well, that's true. But there is an overlay in public disclosure in Washington to protect the identities of these particular officers because of the role that they played. That's RCW 4256-237C. There was a legal foundation to withhold these officers' names to protect their identities as undercover investigative officers. And the context of the publications that were occurring about working with confidential informants, that was so critical. I mean, that should have been considered. And actually, the one person who was directed to give that information to the media by name in deposition was very apologetic about that and felt like he should have given due consideration to the need to be confidential on those facts. It's important in that chronology when you analyze disruption that all of the allegations swirling about as to why the prosecutor's office didn't want to work with the officers, they didn't want to work with the officers before they talked to the media. They were trying to get them discredited and were doing a very good job of discrediting them for things that they hadn't even done. The Sheriff's Department put these officers back to work and reestablished the SIU before the Kitsap investigation even was finalized. So there just is no way to say that the fact that Mary Robnett was upset with the statements made to the media, that that in and of itself, that the perspective to view the disruption is from her reaction to it. She overreacted. I have a hard time with that. I mean, whether fair or not, if at the end of the day the prosecuting attorney says we are not going to accept cases from this investigative unit, I can't think of something more disruptive than that for the sheriff to have to deal with. Setting aside good policy, bad policy, fair or not, that seems just pretty clearly disruptive in my mind. How? Why would the investigations not be able to continue? Because the unit ceases to function in order to prosecute cases. That's the whole point. There is an independent discretionary authority on law enforcement to fight crime where it's not necessarily correlated with an individual prosecution in each case. And a lot of the work on narcotics investigations don't result in prosecutions. There are confidential informant cases where you seize the drug, seize the property, and you put a hurt on the business operations. Now, if you're still saying, well, that's within the discretion of the sheriff to decide, okay, shut down the unit. We're not going to allow, we're going to put a hold on these particular investigators doing that work. Then why shun them? Why make them out and publicly say to the media that we have to do this because this is a problem, their behavior is a problem, and we're going to wait now. Even though I set it back up, we're going to wait now for the Kitsap investigation to come out so that we can justify that our shunning them and giving them meaningless work assignments and denying them over time was justified. So if you just look at the disruption factor from the sheriff had the right to shut down the unit, that's too narrow of an analysis to the disruption factor. It needs to be more. Then the one last thing that's important timing-wise, if you look at, there was a representation that the Perez and Benitez analysis captured the work that Schott was doing in his investigative role. That's not true, and it's established by the timeline. Schott's letter to bomb camp that was the only pie for six months came April 6th, 2020. He was conducting his interviews prior to that, and as a result, he generates a letter listing seven cases that he wants to be critical of the SIU officers indiscriminately, as if all these SIU officers were involved in all these cases. They weren't. Ultimately, there is absolutely nothing that's founded as to any of those cases. There was very nominal discipline that was imposed in the Benitez slash Perez matters involving only two of the SIU officers, and there were one oral admonishment, try harder to communicate with command when you're doing these things, and with a command that's not communicating with her for political reasons. Darby was advised to make sure that when you're working with somebody who may be an informant on these street contracts, rather than doing them orally, do them in a written format. Can I ask one last question? I have just one last. I want to just clarify one last point with you. Before the Brady List was released to the press, had there been anything in the press about claims or accusations that there was some wrongdoing going on in the SIU? Right. I believe it was about a two-month time frame when they learned that there was a shutdown and they weren't immediately named. It's when they were named and their names put out there that it became a real concern for the SIU officers and their safety. Was there anything in the public press? Yes. When the SIU was shut down the first time.  People asked questions. Yes. Actually, I think the prosecutor… The officers had not gone to the press yet. Correct. That was a result of the communications between the prosecutor and the sheriff. As the explanations grew as to what was going on and then really what motivated the clients more than anything is that now our names are out there. Right. Okay. All right. Thank you. Thank you, counsel. Thank you both for your helpful arguments. The matter will stand submitted and court is adjourned. All rise.
judges: McKEOWN, PAEZ, SANCHEZ